ORIGINAL

SEALED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | NO.  3:16-CR-240-B |
| v. | |
| | **(Supersedes indictment returned August 30, 2017)** |
| CELESTINE OKWILAGWE        (01)<br> a.k.a. TONY OKWILAGWE<br>PAUL EMORDI                         (02)<br>ADETUTU ETTI                       (03)<br>LOVETH ISIDAEHOMEN          (04) | |

## SECOND SUPERSEDING INDICTMENT

The Grand Jury charges:

At all times material to this second superseding indictment:

### General Allegations

### The Medicare Program (Generally)

1.     The Medicare Program (Medicare) was a federal health care program providing

benefits to individuals who were over the age of 65 or disabled.  Medicare was

administered by the United States Department of Health and Human Services (HHS),

through its agency, the Centers for Medicare and Medicaid Services (CMS).  Individuals

receiving benefits under Medicare were referred to as Medicare "beneficiaries."

2.     Medicare was a "health care benefit program" as defined by 18 U.S.C. § 24(b).

3.     Physicians, clinics, and other health care providers that provided services to

Medicare beneficiaries were able to apply for and obtain a Medicare "provider number."

Medicare provider numbers enabled health care providers to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

4.    Medicare required providers to accurately and truthfully complete a Medicare application to become providers. The application required disclosure of parties with an "ownership interest and/or managing control" in the provider business to ensure those parties were not excluded from participating in the Medicare program.

5.    Medicare providers were required to certify that "neither this provider, nor any physician owner or investor or any other owner, partner, officer, director, managing employee, authorized official, or delegated official thereof is currently sanctioned, suspended, debarred, or excluded by the Medicare or State Health Care Program, e.g., Medicaid program, or any other Federal program, or is otherwise prohibited from supplying services to Medicare or other Federal program beneficiaries." Medicare providers were also required to disclose any adverse legal history for all individuals and entities with an "ownership interest and/or managing control." Medicare providers were required to update the application if this information changed.

6.    "Part A" of the Medicare program covered certain eligible home health care costs for medical services provided by a home health care agency (HHA) to beneficiaries requiring home health services because of an illness or disability causing them to be homebound. Payments for home health care medical services under Medicare Part A were typically made directly to an HHA or a provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiaries themselves.

7.     The Medicare program paid for home health services only if the beneficiary qualified for home healthcare benefits.  A beneficiary qualified for home healthcare benefits only if:

   a.  the beneficiary was confined to the home, also referred to as homebound

   b.  the beneficiary was under the care of a physician who specifically determined there was a need for home healthcare and established the Plan of Care (or POC, described in Paragraph 10, below); and the determining physician signed a certification statement specifying that:

      i.  the beneficiary needed intermittent skilled nursing services,  physical therapy, or speech therapy;

      ii.  the beneficiary was confined to the home;

      iii.  a POC for furnishing services was established and periodically reviewed; and

      iv.  the services were furnished while the beneficiary was under the care of the physician who established the POC.

8.     Medicare Part A regulations required HHAs providing services to Medicare beneficiaries to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their beneficiaries, as well as records documenting actual treatment of the beneficiaries to whom services were provided and for whom claims for payment were submitted by the HHA.

9.     These medical records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program.

10.     Among the written records required to document the appropriateness of home healthcare claims submitted under Part A of Medicare was a POC, which included the physician order for home healthcare, diagnoses, types of services, frequency of visits, prognosis, rehabilitation potential, functional limitations, activities permitted, medications, treatments, nutritional requirements, safety measures, discharge plans, goals, and physician signature.  A POC signed and dated by the physician, or a signed and dated written prescription, or a verbal order recorded in the POC were required in advance of rendering services.  Also required was a signed certification statement by an attending physician certifying that the beneficiary was confined to his or her home and was in need of the planned home health services, and an assessment of the beneficiary's condition and eligibility for home health services, called an Outcome and Assessment Information Set (OASIS).  The OASIS also set the basis by which the HHA was paid. The more severe a beneficiary's medical conditions, as reflected by the OASIS, the more money Medicare would pay the HHA for providing care.

11.     Medicare Part A regulations required provider HHAs to maintain medical records of each visit made by a nurse, therapist, or home healthcare aide to a beneficiary.  The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the beneficiary, any teaching and the understanding of the beneficiary, and any changes in the beneficiary's physical or emotional condition.  The home healthcare nurse, therapist, or aide was required to document the hands-on personal care provided to the beneficiary if the services were deemed necessary to maintain the beneficiary's health or to facilitate

treatment of the beneficiary's primary illness or injury.  These written medical records were generally created and maintained in the form of "visit notes" and "home health aide notes/observations."

### The Medicaid Program (Generally)

12.     The Texas Medicaid Program (Medicaid) was implemented in 1967 under the provisions of Title 19 of the Social Security Act of 1965.  The State of Texas and the Federal government shared the cost of funding the Texas Medicaid Program.  The Medicaid program helped pay for reasonable and necessary medical procedures and services provided to individuals who were deemed eligible under state low-income programs.

13.     Medicaid was "a health care benefit program" as defined by 18 U.S.C. § 24(b).

14.     To receive reimbursement from Medicaid, a provider was required to truthfully and accurately submit an application and become an approved Medicaid provider.  If the provider met certain minimum qualifications, Medicaid approved the application and the provider was issued a unique identification number also known as a "provider number." The provider was then allowed to submit claims to Medicaid for reimbursement for the cost of providing medically necessary services to Medicaid beneficiaries.

15.     Medicaid required providers to disclose parties with an ownership interest and/or managing control in the provider business to ensure those parties were not excluded from participating in the Medicaid program.

16.    Personal Assistance Services ("PAS") were a Medicaid benefit that provided beneficiaries with services that aided in living independently.  PAS included, among other things, bathing, housekeeping, meal preparation, and grocery shopping.

17.    To provide PAS, an agency was required to be licensed as a home and community support services agency by the Texas Department of Aging and Disability Services ("DADS").  DADS required agencies to submit an application, develop policies and procedures, and undergo monitoring audits every other year.  Once licensed, DADS provided all agencies with a handbook that detailed the rules and regulations pertaining to PAS.

18.    DADS required providers to disclose parties with an ownership interest or control in the provider business, and to certify that no person associated with the provider had been convicted of a crime related to health care.  Providers were required to provide immediate written notice to DADS upon learning that any information provided was incorrect or had changed.

19.    DADS required providers to certify that neither the provider nor its principals, including officers, directors, owners, partners, and persons having primarily management and supervisory responsibilities within the company, were presently excluded from participation in Medicare, Medicaid, or any Federal or state health care program.

20.    DADS required providers to conduct monthly checks of the Federal and state exclusion list websites to ensure that no employees were excluded from participating in a Federal health care program since the last monthly check.

### Exclusion Process for Federal Health Care Programs

21.     The Department of Health and Human Services, Office of Inspector General

(HHS-OIG) was required to exclude providers from Medicare, Medicaid, and all Federal

health care programs upon the conviction of a health care offense.  A conviction included

both a plea of guilty and the receipt of a deferred sentence.

22.     Exclusion prohibited the payment by any Federal health care program, including

Medicare and Medicaid, for any items or services the excluded person furnished, ordered,

or prescribed in any capacity, and further prohibited employment in any capacity to

provide any items or services that were billed to a Federal health care program.  Such

items included administrative, clerical, and other activities that did not directly involve

patient care or the provision of any health care related services.

23.     The minimum period of exclusion was at least five years.  Reinstatement was not

automatic.  An excluded provider was required to reapply to the Medicare and Medicaid

programs for reinstatement after the period of exclusion.

24.     HHS-OIG maintained an online Exclusion Database that allowed members of the

public to search for providers by name to determine if a provider had been excluded.

### Elder Care Home Health Services, LLC

25.     Elder Care Home Health Services, LLC (Elder Care) was a Texas limited liability

company doing business at 6523C Duck Creek Drive, Garland, Texas and incorporated

on April 16, 2001.  Elder Care initially applied to become a Medicare Provider on April

16, 2001.  Elder Care was at all times owned and controlled by defendants **Celestine**

**Okwilagwe** and **Loveth Isidaehomen**.

26.     From in or about January 2013 through in or about May 2016, the exact dates

being unknown to the Grand Jury, Elder Care submitted claims to Medicare and

Medicaid for home health services and PAS.  During this period, Elder Care billed

Medicare and Medicaid over $3.7 million for claim reimbursements to which it was not

entitled.

27.     From in or about January 2013 to in or about May 2016, the exact dates being

unknown to the Grand Jury, Elder Care received payments from Medicare and Medicaid

for claims Elder Care submitted to Medicare and Medicaid into Wells Fargo bank

accounts ending in 9280, 9574, and 2858.  Defendants **Celestine Okwilagwe** and **Loveth**

**Isidaehomen** were authorized to transact business on these bank accounts.

### Defendants and Coconspirators

28.     Defendant **Celestine Okwilagwe**, a resident of Dallas County, Texas, was an

Administrator, Director, and owner of Elder Care and spouse of defendant **Loveth**

**Isidaehomen**.

29.     Defendant **Paul Emordi**, a resident of Dallas County, Texas, was an

Administrator and the Supervisor of PAS providers for Elder Care.

30.     Defendant **Adetutu Etti**, a resident of Dallas County, Texas, was an Administrator

and Director of Nurses for Elder Care.

31.     Defendant **Loveth Isidaehomen**, a resident of Dallas County, Texas was an owner

of Elder Care and spouse of defendant **Celestine Okwilagwe**.

32.     H.M. was a licensed physician in the State of Texas.

33.     K.R. was a licensed physician in the State of Texas.

34.     S.C. was a licensed physician's assistant in the State of Texas who employed K.R.

## Defendants' Exclusion from Federal Health Care Programs

35.     On or about April 12, 2010, **Celestine Okwilagwe**, **Paul Emordi**, and **Loveth Isidaehomen** were indicted for a felony offense associated with the delivery of a health care item or service arising from their involvement with South Medical Supply and Equipment ("South Medical").

36.     On or about June 21, 2012, defendants **Celestine Okwilagwe** and **Paul Emordi** each pled guilty to a misdemeanor offense stemming from their April 12, 2010, indictment and each received a deferred sentence.  **Loveth Isidaehomen's** case was dismissed on or about April 18, 2012.

37.     On or about January 3, 2013, HHS-OIG notified defendants **Celestine Okwilagwe** and **Paul Emordi** that they were each excluded from participation in Medicare, Medicaid, and all Federal health care programs as defined in 1128B(f) of the Social Security Act for a period of five years.  HHS-OIG based the exclusions on **Celestine Okwilagwe's** and **Paul Emordi's** pleas of guilty to a criminal offense related to the delivery of an item or service under a Federal health care program, including Medicare or Medicaid.  This exclusion prohibited **Celestine Okwilagwe** and **Paul Emordi** from submitting or causing the submission of claims to, and receiving funds from, Federal health care programs such as Medicare and Medicaid, and further prohibited defendants **Celestine Okwilagwe** and **Paul Emordi** from furnishing, ordering, or prescribing any item or service, including administrative and managerial services that would be paid for, in whole or in part, by Medicare or Medicaid.

38.     On or about January 18, 2013, defendants **Celestine Okwilagwe** and **Paul Emordi** appealed their respective exclusions from the Medicare and Medicaid programs.

39.     On or about March 27, 2013, an HHS Administrative Law Judge informed **Paul Emordi** that his appeal had been denied and his exclusion from participation in the Medicare and Medicaid programs for a period of five years was upheld.

40.     On or about September 6, 2013, an HHS Administrative Law Judge denied **Celestine Okwilagwe's** appeal and informed him that his exclusion from participation in the Medicare and Medicaid programs for a period of five years was upheld.

<u>Count One</u>
Conspiracy to Commit Health Care Fraud
(Violation of 18 U.S.C. § 1349 (18 U.S.C. § 1347))

41.    The Grand Jury re-alleges and incorporates by reference as if fully alleged herein

paragraphs 1 through 40 of the General Allegations of this second superseding

indictment.

## The Conspiracy

42.    From in or about April 2010 and continuing to in or about May 2016, the exact

dates being unknown to the Grand Jury, in the Dallas Division of the Northern District of

Texas and elsewhere, the defendants,

**Celestine Okwilagwe,**
**Paul Emordi,**
**Adetutu Etti**, and
**Loveth Isidaehomen**

did knowingly and willfully combine, conspire, confederate, and agree with each other

and with other persons known and unknown to the Grand Jury, to commit certain

offenses against the United States, that is, to knowingly and willfully execute, and

attempt to execute, a scheme and artifice: (a) to defraud Medicare and Medicaid, both

health care benefit programs as defined in 18 U.S.C. § 24(b); and (b) to obtain money and

property owned by and under the custody and control of Medicare and Medicaid, both

health care benefit programs as defined in 18 U.S.C. § 24(b), by means of materially false

and fraudulent pretenses, representations, and promises, in connection with the delivery

of and payment for health care benefits, items and services, in violation of 18 U.S.C.

§ 1347.

## Object of the Conspiracy

43.     It was the object of the conspiracy for the defendants and others known and

unknown to the Grand Jury to unlawfully enrich themselves by concealing defendants

**Celestine Okwilagwe's** and **Paul Emordi's** ownership interests and managerial roles in

Elder Care and by submitting false and fraudulent claims to Medicare and Medicaid for

reimbursement to which Elder Care was not entitled.

## Manner and Means of the Conspiracy

44.     The manner and means by which the defendants sought to accomplish the object

of the conspiracy included, among other things:

## The Scheme to Defraud

45.     Defendants **Celestine Okwilagwe** and **Paul Emordi**, once excluded from the

Medicare and Medicaid programs, continued to bill Medicare and Medicaid by

submitting and causing the submission of claims under a Medicare Provider Number

registered to Elder Care.

46.     Defendants **Celestine Okwilagwe**, **Adetutu Etti**, and **Loveth Isidaehomen**

knowingly caused to be submitted to Medicare, Medicaid, and DADS, applications and

contracts for Elder Care, which concealed and failed to disclose that defendants **Celestine**

**Okwilagwe** and **Paul Emordi** had ownership interests and managerial roles in Elder

Care and which falsely indicated that G.O. was the owner of Elder Care.  Defendant

**Adetutu Etti** signed these false applications despite knowing that defendants **Celestine**

**Okwilagwe** and **Paul Emordi** had ownership interests and managerial roles in Elder

Care, and that G.O. had not worked at Elder Care for several years and was not an owner of Elder Care.

47. Defendants **Celestine Okwilagwe**, **Adetutu Etti**, and **Loveth Isidaehomen** knowingly caused to be submitted to Medicare, Medicaid, and DADS, applications and contracts for Elder Care which concealed and failed to disclose that defendants **Celestine Okwilagwe** and **Paul Emordi** had been excluded from participation in all Federal health care programs and which falsely indicated that all employees of Elder Care were checked in the HHS-OIG Exclusion Database. Defendant **Adetutu Etti** signed these false applications despite knowing that she had not checked any Elder Care employees to see if they were excluded prior to submitting the applications.

48. On or about January 23, 2013, the same day **Celestine Okwilagwe** and **Paul Emordi** were excluded from Medicare and Medicaid, **Loveth Isidaehomen** was added as a signatory to Elder Care's Wells Fargo bank account ending in 2858.

49. On or about January 25, 2013, **Loveth Isidaehomen** began signing business expense checks, including employee paychecks, from Elder Care's Wells Fargo bank accounts ending in 2858 and 9574.

50. **Loveth Isidaehomen** signed paychecks issued to the wife of **Paul Emordi** in order to conceal **Paul Emordi's** involvement with Elder Care.

51. Defendant **Celestine Okwilagwe** failed to file 2010 and 2011 Texas Franchise Tax Public Information Reports which otherwise would have reflected that he was a Director and Administrator for Elder Care.

52.    Defendant **Adetutu Etti** knowingly signed and submitted a 2012 Texas Franchise Tax Public Information Report, which concealed and failed to disclose **Celestine Okwilagwe's** role in Elder Care, despite knowing that defendant **Celestine Okwilagwe** was an owner of Elder Care.

53.    Defendant **Celestine Okwilagwe** concealed his role in Elder Care by altering his name on internal and external Elder Care documents and contracts.

54.    Defendants **Celestine Okwilagwe** and **Paul Emordi** had ownership and managerial roles at Elder Care and, in violation of their exclusions from all Federal health care programs, submitted and caused to be submitted claims for reimbursement to Medicare and Medicaid.

55.    Defendant **Adetutu Etti** created and signed false physician verbal order forms to make it appear as though a treating physician had ordered home health services for beneficiaries when in fact no physician had ordered the services.

56.    Defendant **Adetutu Etti** and others provided these false physician verbal order forms to K.R. and H.M. for their signatures to continue the scheme.

57.    K.R. and H.M. would falsely certify that beneficiaries needed and qualified for home health services when the beneficiaries were not under the care of K.R. or H.M.

58.    On or about April 14, 2014, defendant **Adetutu Etti** caused Medicare to be billed for home health services for Medicare beneficiary W.M. when W.M. was not homebound, did not need home health services, and was not under the care of K.R.

59.     On or about June 17, 2014, defendant **Adetutu Etti** caused Medicare to be billed for home health services for Medicare beneficiary W.M. when W.M. was not homebound, did not need home health services, and was not under the care of K.R.

60.     From January 2013 through May 2016, defendants **Celestine Okwilagwe, Paul Emordi, Adetutu Etti**, and **Loveth Isidaehomen** caused the payment of Medicare and Medicaid funds to Elder Care for items or services, including administrative and managerial services, that defendants **Celestine Okwilagwe** and **Paul Emordi** were excluded from providing and which were based on false and fraudulent documentation in excess of approximately $3.7 million.

All in violation of 18 U.S.C. § 1349 (18 U.S.C. § 1347).

<u>Count Two</u>
False Statements in Health Care Matters
(Violation of 18 U.S.C. § 1035 and 2)

61.     The Grand Jury re-alleges and incorporates by reference as if fully alleged herein paragraphs 1 through 40 of this second superseding indictment.

62.     In or about October 2015, in the Northern District of Texas, Dallas Division, defendants **Celestine Okwilagwe** and **Adetutu Etti** knowingly and willfully made a materially false, fictitious and fraudulent statement and representation, namely that G.O. was the sole owner of Elder Care when in fact **Celestine Okwilagwe** and **Loveth Isidaehomen** were the sole owners of Elder Care, in connection with the payment for health care benefits, items and services involving Medicaid, a health care benefit program as defined in 18 U.S.C. § 24.

In violation of 18 U.S.C. § 1035.

<u>Count Three</u>
False Statements in Health Care Matters
(Violation of 18 U.S.C. § 1035 and 2)

63.     The Grand Jury re-alleges and incorporates by reference as if fully alleged herein

paragraphs 1 through 40 of this second superseding indictment.

64.     On or about June 23, 2015, in the Northern District of Texas, Dallas Division,

defendants **Celestine Okwilagwe** and **Adetutu Etti** knowingly and willfully made a

materially false, fictitious and fraudulent statement and representation, namely, that G.O.

was the sole owner of Elder Care when in fact **Celestine Okwilagwe** and **Loveth**

**Isidaehomen** were the sole owners of Elder Care, in connection with the payment for

health care benefits, items and services involving Medicaid, a health care benefit program

as defined in 18 U.S.C. § 24.

In violation of 18 U.S.C. § 1035.

Forfeiture Notice

18 U.S.C. §§ 981(a)(1)(C) and 982(a)(7) and 28 U.S.C. § 2461(c)

65.     The Grand Jury re-alleges and incorporates by reference as if fully alleged herein

paragraphs 1 through 64 of this second superseding indictment.

66.     Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. 2461(c), upon conviction of

the offenses in Counts One, the defendants

**Celestine Okwilagwe**,
**Paul Emordi**,
**Adetutu Etti**, and
**Loveth Isidaehomen**

shall forfeit to the United States, any property, real or personal, which constitutes or is

derived from proceeds traceable to the Count One offense.

67.     Pursuant to 18 U.S.C. § 982(a)(7), upon conviction of the offenses in Counts Two

and Three, the defendants

**Celestine Okwilagwe**, and
**Adetutu Etti**,

shall forfeit to the United States, any property, real or personal, which constitutes or is

derived from proceeds traceable to the Count One offense.

68.     The property subject to forfeiture includes, but is not limited to, gross proceeds of

the offenses and the defendants are notified that upon conviction, a money judgment may

be imposed equal to said amount.

69.     Pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), if any of

the property described above, as a result of any act or omission of the defendant:

        a.     cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without

difficulty,

the United States intends to seek forfeiture of any other property of the defendant up to

the value of the forfeitable property described above.

A TRUE BILL

_____

FOREPERSON

ERIN NEALY COX
UNITED STATES ATTORNEY

_____
ADRIENNE E. FRAZIOR
Assistant United States Attorney
Texas State Bar No. 24059546
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:    214-659-8600
Facsimile:    214-659-8805
Email:        adrienne.frazior@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THE UNITED STATES OF AMERICA

v.

CELESTINE OKWILAGWE
aka TONY OKWILAGWE (1)
PAUL EMORDI (02)
ADETUTU ETTI (3)
LOVETH ISIDAEHOMEN (4)

SEALED SECOND SUPERSEDING INDICTMENT

18 U.S.C. § 1349 (18 U.S.C. § 1347)
Conspiracy to Commit Health Care Fraud

18 U.S.C. § 1035 and 2
False Statements in Health Care Matters

18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)
Forfeiture Notice

3 Counts

A true bill rendered

----------------------------------------------------------------------------------

DALLAS                                                          FOREPERSON

Filed in open court this 20th day of December, 2017.

----------------------------------------------------------------------------------

**Warrant to be Issued for Loveth Isidaehomen**

----------------------------------------------------------------------------------

UNITED STATES MAGISTRATE JUDGE
Criminal Case Pending:  3:16-CR-240-B